JUSTICE BAKER,
concurring in part and dissenting in part.
¶91 I join the Court’s opinion and holding with respect to Issue 1. I dissent with respect to Issue 2, and I would not reach Issues 3 or 4.
¶92 As indicated in the Court’s order of April 12,2012,1 would reverse the District Court’s decision to decertify LR-119 from the June 5,2012 ballot and hold this appeal in abeyance pending the results of that election. I would not reach the constitutional challenge absent approval of the measure by a majority of voters casting ballots in the special election held for that purpose. Accordingly, I express no opinion on the merits of the constitutional issues or the Court’s analysis in that regard.
¶93 We have long recognized “the principle that ‘initiative and referendum provisions of the Constitution should be broadly construed to maintain the maximum power in the people.’” Nicholson v. Cooney, 265 Mont. 406, 411, 877 P.2d 486, 488 (1994) (quoting Chouteau County v. Grossman, 172 Mont. 373, 378, 563 P.2d 1125, 1128 (1977). “A referendum is not a single act, it is a process. That process is not complete until the electorate has spoken.” Harper v. Greely, 234 Mont. 259, 269, 763 P.2d 650, 656 (1988) (quoting the ruling of then-District Judge Gordon R. Bennett). The Supreme Court is not part of this two-step legislative referendum process. Instead, the Court rules on constitutionality of legislation only if, and after, a duly-enacted law has been challenged. Here, displaying “lack of confidence in the knowledge of the voters,” Mont. Consumer Fin. Ass’n v. State, 2010 MT 185, ¶ 24, 357 Mont. 237, 238 P.3d 765 (Morris, J., concurring), and contrary to well-established tenets of judicial review, the Court has pre-empted the legislative referendum process to reach the merits of the constitutional issues.
*135 ¶94 Although this Court has entertained pre-election challenges to ballot issues, historically we have done so sparingly. We have enjoined placement on the ballot of citizen-initiated measures in cases where the measure was “unquestionably and palpably unconstitutional on its face,” State ex rel. Steen v. Murray, 144 Mont. 61, 69, 394 P.2d 761, 765 (1964), such as an initiative that interfered with the “independent legislative power vested in the legislature” by compelling the legislature “to reach a specific result under threat of confinement and no pay.” State ex rel. Harper v. Waltermire, 213 Mont. 425, 429, 691 P.2d 826, 829 (1984). “[BJecause of the safeguards already built into the referendum process,” Harper, 234 Mont. at 268, 763 P.2d at 656, we have been even more sparing in intervening to stop election on a measure referred by the legislature. In Cobb v. State, 278 Mont. 307, 309, 924 P.2d 268, 269 (1996), we exercised review over a pre-election challenge to a legislatively-proposed constitutional amendment on the ground that its approval by voters “would leave a defect in the constitution which could not be remedied except by another election.” (Emphasis added.) Extensive research has produced no other cases in which the Court has enjoined placement of a legislative referendum on the ballot.
¶95 Our decision in Cobb was rendered in accordance with a statute in place at the time that allowed a pre-election challenge to an initiative or referendum if it challenged a “constitutional defect in the substance of a proposed ballot issue.” Section 3-5-302(6)(a)(ii), MCA (1995). On the other hand, when the legislature has prescribed a specific process for a court challenge to a ballot measure, we have refused to intervene prior to the election if that process was not followed. State ex rel. Mont. Citizens for the Preservation of Citizens’ Rights v. Waltermire, 224 Mont. 273, 278, 729 P.2d 1283, 1286 (1986). The statutory language under which our authority was exercised in Cobb has since been repealed. In its place, the Legislature has expressly preserved “the right to challenge a constitutional defect in the substance of an issue approved by a vote of the people.” Section 13-27-316(6), MCA (emphasis added).
¶96 Withholding consideration of the alleged constitutional defect in LR-119 until after the election-and then, obviously, only if the measure passed-would comport with the process set forth in the statute and remain true to the restraint that characterizes our consideration of constitutional challenges. “[T]he constitutional requirement of a ‘case or controversy’ contemplates real controversies and not abstract differences of opinion.” Greater Missoula Area Fed’n *136 of Early Childhood Educators v. Child Start, Inc., 2009 MT 362, ¶ 23, 353 Mont. 201, 219 P.3d 881. Among the categories subsumed in the “case or controversy” requirement are the doctrine of ripeness and the refusal to issue advisory opinions. Greater Missoula, ¶ 23. “The doctrine of ripeness ‘requires an actual, present controversy, and therefore a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative.’ ” Havre Daily News, LLC v. City of Havre, 2006 MT 215, ¶ 19, 333 Mont. 331, 142 P.3d 864 (quoting Mont. Power Co. v. Mont. Pub. Serv. Comm’n, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91). We have followed the guiding principle that “courts should avoid constitutional issues whenever possible.” Sunburst Sch. Dist. No. 2 v. Texaco, Inc., 2007 MT 183, ¶ 62, 338 Mont. 259, 165 P.3d 1079; Baxter v. State, 2009 MT 449, ¶ 10, 354 Mont. 234, 224 P.3d 1211. The Court cites to no case in which a court has determined a statute to be ripe for constitutional challenge before it was enacted. Prior to approval by the voters, the constitutional dispute at issue regarding residency qualifications and district elections for Supreme Court justices does not rise above an abstract difference of opinion. Depending on the election results, there may never have been a constitutional issue to consider.
¶97 The Court determines that LR-119 presents unique grounds for pre-election review because of its effect in the current election cycle, observing that the measure threatened to disenfranchise voters outside the Fifth and Sixth Supreme Court Districts. (Opinion ¶ 58.) The Court’s concerns, however, conflate the merits of the constitutional issues with the timing of their consideration. The legislature clearly was within its authority to order a special election in conjunction with the June 5 primary election. Mont. Const, art. III, § 6; State ex rel. Gould v. Cooney, 253 Mont. 90, 94, 831 P.2d 593, 595 (1992). At that election, all Montana voters would have been given the opportunity to vote on LR-119, and all Montana voters would have been able to vote for all Supreme Court positions on the ballot. If, and only if, LR-119 passed would anyone’s right to vote have been affected in the general election. As illustrated by the efficiency with which this appeal was briefed, considered and decided, we easily could have held the appeal in abeyance, awaited certification of the June 5 election results, and decided the case-if necessary-within a few weeks. The only impact may have been a few weeks of lost statewide campaigning time by successful primary candidates, but they are not even parties to the challenge. Ironically, the only “disenfranchisement” of voters results from the Court’s decision to remove LR-119 from the ballot.
*137 ¶98 The Court’s ruling that the measure’s facial invalidity requires its immediate consideration also is unconvincing. First, the District Court acknowledged, and the Plaintiffs do not appear to dispute, that not all provisions of LR-119 are facially unconstitutional. The District Court agreed that the Montana Constitution does not prohibit the legislature from creating Supreme Court districts or from having the Chief Justice selected by the other members of the Court. Whether or not these provisions, if constitutional, could be severed from the measure would have been appropriate and better suited for consideration only if the referendum passed and became law.
¶99 Finally, the Court holds that it would have been a “waste of time and money” to place the measure on the ballot. (Opinion ¶ 59.) Although I agree that delays in this case, including the State’s inexplicable failure to secure a stay of the District Court’s decision, were regrettable and have made the process tortuous and more costly than necessary, these types of emergencies are not uncommon in election matters and the court system is equipped to deal with them. I cannot ascribe “no corresponding benefit” (Opinion ¶ 59) to the fulfillment of our Constitution’s guarantee of the right of initiative and referendum. The “consum[ption of] resources” in this case (Opinion ¶ 59) is not sufficient to outweigh the people’s right to vote. The Court’s decision to protect the voters from a measure referred by the legislature is patronizing and elevates judicial economy above respect for the constitutional process and the people’s role in it.
¶100 We should decline to interfere with the initiative and referendum process “unless it appears to be absolutely essential.” Mont. Citizens for the Preservation of Citizens’ Rights, 224 Mont. at 276, 729 P.2d at 1285. Because a decision on the constitutional issues could have been rendered quickly following the primary election had the referendum passed, the Court’s interference now is not, in my view, “absolutely essential.” I dissent.
*138 LEGISLATIVE REFERENDUM NO. 119 BALLOT LANGUAGE
LEGISLATIVE REFERENDUM NO. 119
AN ACT REFERRED BY THE LEGISLATURE
AN ACT REQUIRING THAT SUPREME COURT JUSTICES BE ELECTED AND APPOINTED FROM SUPREME COURT DISTRICTS; ESTABLISHING SUPREME COURT DISTRICTS; PROVIDING THAT THE PROPOSED ACT BE SUBMITTED TO THE QUALIFIED ELECTORS OF MONTANA AT A SPECIAL ELECTION TO BE HELD CONCURRENTLY WITH THE 2012 PRIMARY ELECTION; AMENDING SECTIONS 3-2-101 AND 3-2-102, MCA; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE AND AN APPLICABILITY DATE.
The Montana Supreme Court is composed of seven justices, one of whom Is Chief Justice. Under current law, the justices are elected statewide and each Montanan votes for all seven positions. LR-119 would change existing law so that each justice is elected from one of seven districts of approximately equal population, with the Chief Justice then chosen from the seven by majority vote of the justices. Only Montanans living in each district would vote for their district's justice. Justices must reside In their district when initially elected.
[] FOR requiring supreme court justices to be elected or appointed from districts with approximately equal populations.
[] AGAINST requiring supreme court justices to be elected or appointed from districts with approximately equal populations.
*139 THE COMPLETE TEXTOF SENATE BILL NO. 268, REFERRED BY LR-119
AN ACT REQUIRING THAT SUPREME COURT JUSTICES BE ELECTED AND APPOINTED FROM SUPREME COURT DISTRICTS; ESTABLISHING SUPREME COURT DISTRICTS; PROVIDING THAT THE PROPOSED ACT BE SUBMITTED TO THE QUALIFIED ELECTORS OF MONTANA AT A SPECIAL ELECTION TO BE HELD CONCURRENTLY WITH THE 2012 PRIMARY ELECTION; AMENDING SECTIONS 3-2-101 AND 3-2-102, MCA; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE AND AN APPLICABILITY DATE.
BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:
Section 1. Section 3-2*101, MCA, Is amended to read:
"3-2-101. Number, election, and term of office - selection of chief justice. (11 The supreme court consists of a chief justice and six associate justices who aro- oloctod-by the qualified oloctors of the state-at largo must be qualified electors of the district from which they are elected, with each member elected from a separate district of the state as provided In (section 31. Each justice must be elected at the general state-elections election next preceding the expiration of the terms term of office of their-prcdccessors, respectively, the justice's predecessor and hold-thoir-officos holds office for the term of 8 years from andaftor the first Monday of January next succeeding theif the justice's election.
(21 After the general election in 2016. the chief justice must be selected by the majority vote of the seven justices at the first meeting of the court in each year after a general election."
Section 2. Section 3-2-102, MCA, is amended to read:
"3-2-102. Qualifications and residence. (1) A person is not eligible for the office of justice of the supreme court unless the person is a citizen of the United States, has resided in the state 2 years immediately before taking office, and has been admitted to practice law in Montana for at least 5 years prior to the date of appointment or election.
(2) Justices of the supreme court must reside within the state during their terms of office. Once elected from a district, a justice is not required to reside within the district during the justice's service in office.
(31A supreme court justice must, at the time of initial election, be a qualified elector of the supreme court district from which the justice is elected. A supreme court justice appointed to fill a vacancy must, at the time of appointment, be a qualified elector of the same initial supreme court district as the justice being replaced, and in an election following an appointment, the elected justice must be a qualified elector of the Initial district."
Section 3. Supreme court districts defined -- number of judges. (1) In this state there are seven supreme court judicial districts, distributed as follows:
(a) 1st district: Cascade, Chouteau, Fergus, Golden Valley, Hill, Judith Basin, Liberty, Meagher, Pondera, Teton, and Wheatland Counties;
2
*140 (b) 2nd district: Big Horn, Blaine, Carbon, Carter, Custer, Daniels, Dawson, Fallon, Garfield, McCone, Musselshell, Park, Petroleum, Phillips, Powder River, Prairie, Richland, Roosevelt, Rosebud, Sheridan, Stillwater, Sweet Grass, Treasure, Valley, and Wibaux Counties;
(c) 3rd district: Yellowstone County;
(d) 4th district: Lewis and Clark, Deer Lodge, Granite, Jefferson, Ravalli, Powell, and Broadwater Counties;
(e) 5th district: Flathead, Lincoln, Glacier, Sanders, and Toole Counties;
(f) 6th district: Gallatin, Madison, Beaverhead, and Silver Bow Counties;
(g) 7th district: Missoula, Lake, and Mineral Counties.
(2) There must be one supreme court justice selected from each district.
(3) The legislature shali review the districts after each decennial census for purposes of maintaining districts with approximately equal populations while following county
Section 4. Transition. (1) [This act] may not remove any justice that is holding office on [the effective date of this act] during the term for which the justice was elected or appointed. After [the effective date of this act], each sitting associate justice must be assigned to the judicial district that corresponds to the associate justice's current seat number and the chief justice must be assigned to the seventh district.
(2) (a) Except as provided in subsection (2)(b), each supreme court justice who chooses to seek reelection at the end of the justice’s current term shall run for reelection in the district to which the justice is assigned under subsection {!}.
(b) A sitting justice that chooses to seek election in a district other than the district assigned under subsection (1) may run for election in the district if the justice resigns the justice's current seat effective as of the date the justice flies for election in the district to which the justice seeks election.
(3) In the 2012 election, the two candidates receiving the most votes In the primary for each seat up for reelection advance to.the 2012 general election for the district that corresponds to the same seat number.
Section 5. Codification instruction. (Section 3] is intended to be codified as an Integral part of Title 3, chapter 2, and the provisions of Title 3, chapter 2, apply to [section 3].
Section 6. Severability, if a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.
Section 7. Effective date. [This act] is effective upon approval by the electorate.
Section 8. Applicability. [This act] applies to the election and appointment of supreme court justices to terms that begin on or after [the effective date of this act].
3
*141 Section 9. Submission to electorate. [This act] shall be submitted to the qualified electors of Montana at a special election to be held concurrently with the primary election held in the spring of 2012 by printing on the ballot the full title of [this act] and the following:
(] FOR requiring supreme court justices to be elected or appointed from districts with approximately equal populations.
[] AGAINST requiring supreme court justices to be elected or appointed from districts with approximately equal populations.
4